Filed 7/24/14  In re L.R. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re L.R., a Person Coming Under the Juvenile Court Law. | B251885 (Los Angeles County Super. Ct. No. DK00301) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARGARET R.,<br><br>Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge.  Affirmed in part and reversed in part with directions.

Catherine C. Czar, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jeanette Cauble, Senior Deputy County Counsel, for Plaintiff and Respondent.

M. Elizabeth Handy, under appointment by the Court of Appeal, for Minor.

———————————

Margaret R. appeals from the jurisdiction and disposition orders of the juvenile court in this dependency proceeding involving her granddaughter. With respect to the jurisdiction order, we find insufficient evidence to support the court's exercise of jurisdiction based on inappropriate physical discipline, and agree with appellant that the jurisdictional findings must be reversed on that ground. We are not persuaded, however, by appellant's remaining arguments. Accordingly, we affirm in part, reverse in part and remand with directions.

## PROCEDURAL HISTORY

On August 5, 2013, respondent Los Angeles Department of Children and Family Services (DCFS) filed a petition pursuant to Welfare and Institutions Code[1] section 300, subdivisions (a), (b), (d) and (j) on behalf of minor L.R. (born June 1998), and her brother J.R. (born September 1995, who is not a subject of this appeal), after receiving an emergency referral of a sexual abuse incident perpetrated on L.R. by J.R. while in the family's pool. Following a detention hearing, L.R. was placed temporarily in foster care and J.R. was released to the care of appellant Margaret R., the children's maternal grandmother and adoptive mother (grandmother).[2] Visits between L.R. and her grandmother were to be supervised in a therapeutic setting. L.R. refused to participate in visits.

A jurisdictional and dispositional hearing was conducted on September 11, 2013. The juvenile court amended and sustained the petition as to the section 300, subdivision (b) allegations, and dismissed the remaining counts. L.R. was removed from grandmother's physical custody, and reunification services and monitored visits in a therapeutic setting were ordered.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] The children were court dependents and adopted in 2002, when J.R. was three and L.R. was an infant, after reunification efforts with their biological mother failed. We will refer to appellant as grandmother, as that is what the children call her.

# FACTUAL BACKGROUND

In March 2013, the household consisted of L.R., grandmother, J.R., and the children's adult aunt Rachel (aunt). DCFS received a child abuse referral regarding allegations of sexual abuse. L.R. had disclosed that, a year and a half earlier when she was 13, her then 15-year-old brother had taken both his and her pants off in the family's backyard pool, and attempted unsuccessfully to penetrate her vagina. J.R. stopped after grandmother came into the yard to ask what was going on, grabbed his shorts and ran from the pool. Together with J.R.'s psychiatrist,[3] grandmother and aunt developed a safety plan which required that the children were never alone together. The referral was investigated and deemed unfounded.

On July 30, 2013, a mandated second referral was made regarding the same incident, though this time it was alleged that J.R. had penetrated L.R.'s vagina. L.R. had a medical appointment after discovering bumps in her vaginal area. She said she had not had sex with anyone, but feared she might have contracted an STD because of what J.R. had done. L.R. told the nurse about what happened in the pool, but this time said her brother had penetrated her vagina and it had hurt. She did not want to go home.

In interviews on July 31, 2013, L.R. told a police officer and DCFS social worker that she had been in the backyard pool one day in summer 2011, when she was 13. Her then 15-year-old brother came into the pool, lured her to a corner, and began kissing her on her lips, cheek and neck. She wore a two piece suit. J.R. took her shorts off and touched inside her legs and opened them. L.R. felt an object being inserted into her vagina causing pressure. L.R. did not see J.R.'s penis, but "felt three pressures and almost a fourth." At that point, grandmother interrupted J.R., yelling out, "what are you guys doing[?]" J.R. yelled back, "we are just horsing around." J.R. told L.R., "you better not tell anyone, no one is going to believe you." L.R. felt shocked and embarrassed. She was also afraid her brother—who sometimes hit her when they fought and had once broken grandmother's arm—might hurt her because of his violent history. Later, J.R. told his psychiatrist that L.R. had pulled down

---

[3] J.R., who was diagnosed with autism and ADHD and received IEP services at school, was under a psychiatrist's care for behavioral concerns.

his pants. The therapist met with the family and L.R. disclosed the sexual abuse. Grandmother agreed during that meeting that someone would always watch the children.

L.R. didn't think grandmother really believed the abuse had happened, and thought L.R. was telling a story to get attention. L.R. said grandmother could not have seen what happened between J.R. and her from her location, and had just yelled out at the children. L.R. had been afraid and did not tell grandmother about the incident because she had a reputation as a liar, and because J.R. was grandmother's favorite. L.R. said the pool incident was the sole instance of sexual abuse.

The initial DCFS referral had come after L.R. first disclosed the sexual abuse in late 2012, during a meeting with her school counselor about her falling grades. DCFS was summoned. When the social worker met with L.R., however, L.R. said nothing about the sexual abuse because grandmother was present. Grandmother had stared at L.R. shaking her head, so L.R. said nothing. After the social worker left, grandmother confronted L.R., saying, "'you want something to happen to him, don't you!'"

When asked about grandmother's method of discipline, L.R. told the social worker about an incident in 2012 when grandmother hit her on the head with a baking sheet. L.R. denied suffering any marks or bruises. Apart from that incident, grandmother disciplined L.R. by setting limits, i.e., restricting her ability to hang out with friends, or making her cook or do extra laundry. She complained that J.R. hits her and that when he and she fight, "he might get yelled at, but they blame me for everything." When asked if she felt comfortable and safe living in grandmother's home, L.R. said, "no, I don't like how they treat me there. I don't want to go back."

The social worker inspected the home which was messy and cluttered, but otherwise appropriate. One corner of the backyard pool was less visible than the others from the sliding glass door. The social worker thought someone looking out could see someone standing in the pool, but might not be able to see underwater.

Regarding the pool incident, grandmother told the social worker she had been able to see the whole pool, and saw nothing happen. They had addressed this issue before, and grandmother believed it had already been addressed. While in counseling two years earlier

4

for behavioral problems, J.R. told his counselor that L.R. pulled his pants down in the pool. He didn't know what to do, so he went back indoors. They participated in a family counseling session. The counselor felt it was an isolated event. Grandmother said she and aunt "knew [they] couldn't leave them alone at all and [they] don't." She had asked L.R. if she wanted counseling, but she didn't. Grandmother told the social worker that L.R. has "an imagination," is gifted and writes great stories, "so she is probably exaggerating." Grandmother admitted she once hit L.R. on the head ("mostly on the shoulder") with "one of those store-bought, throw away aluminum trays." Grandmother admitted that she "lost it" during an argument with L.R. over cooking dinner that escalated as L.R. became increasingly disrespectful. Grandmother claimed she had not hit L.R. hard (and could not have done so because her arms are weak due to illness), and the child sustained no marks or bruises. She has never hit L.R. before or since. She also said L.R. was inclined to sneak out, and did not come home when she was supposed to.

When J.R. was interviewed by the social worker he denied any sexual activity between him and his sister. Regarding the incident in the pool, J.R. recalled that he and L.R. had been "pranking each other and [he] pulled her pants down and she pulled mine and then it was just pretty embarrassing." He thought it would be funny, but L.R. was not amused. After he "pantsed her," L.R. also pulled down his pants. J.R. denied kissing his sister or partially penetrating her vagina. He said that "no one touches [him] and [he] never touched [L.R.]." J.R. thought L.R. made up this story because she was angry with him because he had more freedom than she did. She was rebellious and easily influenced by her friends. She snuck out to be with a friend whom grandmother disliked. L.R. was given less freedom "because [she] broke the trust." She could have more if she didn't do things like sneak out. He admitted hitting his sister once on the arm during an argument, but denied doing it again.

The children's aunt had no concerns about their safety in the home. Aunt first learned about the incident of sexual abuse at J.R.'s therapy session two years ago. His account had differed from L.R.'s, "so we just keep them separate, and they are never home alone." Aunt had never seen the siblings touch or act in any way inappropriately with one another. Because L.R. was worried she might have an STD, aunt was concerned that the child might

5

be sexually active. Regarding the incident with the baking pan, aunt told the social worker L.R. had called her at work after she and grandmother argued about making dinner. L.R. had mentioned that grandmother hit her with a baking sheet, but "did not seem to be bothered by it and/or to make a big deal about it." She had not seen any marks or bruises on L.R. Aunt's ex-husband was also interviewed. He had lived in the family home for about a year during an unspecified period. He never saw the children touch each other, and hardly ever saw them together.

The social worker met with L.R. a few days before the jurisdictional hearing. Regarding the incident in the pool, L.R. largely reiterated her earlier factual account. This time, however, L.R. said she had been able to see under water that J.R.'s penis was erect, and said he had fully inserted his penis into her vagina three or four times. Ever since this incident, L.R. had not been left alone and always had to be with grandmother or aunt.

By the time of the jurisdictional hearing, DCFS was satisfied that grandmother's act of inappropriate physical discipline had been an isolated incident, and that she had appropriate measures in place to allow L.R. safely to return home. L.R., however, still did not want to go back for several reasons. One reason was that she did not want J.R. to go to jail, so it would be better if she was gone. (The police had told her "those were the only options.") L.R. also mentioned the incident when grandmother hit her on the head with a metal baking sheet, as well as her belief that J.R. received preferential treatment from grandmother and aunt. She said grandmother "lets J.R. get away with everything. He comes home late and nothing happens, but if I did that I'd get my privileges taken away," whereas J.R. only had time deducted from the amount of time he could stay out the next time. Grandmother and aunt mistakenly "think [L.R.] is always doing something she's not supposed to be doing and that she never helps out around the house."[4] L.R. admitted that

---

[4] L.R. seemed pleased and excited when the social worker told her J.R. had said he believed L.R. was actually the favored child, and that grandmother and aunt believed she was mostly well-behaved and did a good job of helping around the house.

she snuck out to see her friend. She denied doing anything bad, and it upset her that her family believed she was doing stuff with boys.

L.R. liked her foster placement and new school, but would "possibly consider coming home" if she could attend a different school than the one she'd attended before (at which she'd felt bullied), and if grandmother and aunt would be "nicer to her and not tell her she's acting like a 'bitch.'" L.R. also wanted to be allowed to hang out with a particular friend, and "didn't really want to live with her brother." L.R. had not had any visits with grandmother since her detention. She was "debating" whether or not to visit grandmother "because [grandmother] just makes [her] feel low. Like [grandmother] calls [her] a bitch."

Grandmother told the social worker she had heard "two different stories" about the pool incident from the children. J.R. claimed that L.R. came up to him in the pool and pulled down his shorts, and he got out and went indoors. L.R.'s version was what was alleged in the petition. When L.R. initially told her "story," she did not include all the details she now gave. She basically said only that J.R. came up to her in the pool and pressed himself against her. Grandmother denied there had been any recent incidents involving L.R. But L.R. had been having trouble since beginning high school, her grades had dropped and she was sneaking out of the house and not coming home when she was supposed to. Grandmother wanted to visit L.R., and wanted her back at home.

DCFS concluded that J.R. could safely remain at home with grandmother. It also appeared that L.R. would be safe at home, based on the family safety plan that ensured the children were never left unsupervised. DCFS determined that "the family's actions were protective and appropriate." The incident of physical abuse was deemed an isolated one. No previous or subsequent incidents of physical abuse or punishment had been reported. However, "[L.R. was] refusing to return home." Accordingly, the agency recommended that she be declared a juvenile court dependent and remain suitably placed in foster care, that reunification services be provided to grandmother, and that both L.R. and grandmother receive individual counseling and participate in joint counseling, when it was appropriate.

At the conclusion of the jurisdictional hearing, the court sustained amended section 300, subdivision (b) allegations.[5] L.R. was removed from grandmother's physical custody. DCFS was ordered to provide reunification services to the family. Visits would be in a supervised therapeutic setting, once cleared by L.R.'s therapist.

## DISCUSSION

Grandmother contends that there is insufficient evidence to support the court's jurisdictional findings or its dispositional orders.

### 1. Jurisdictional findings

#### a. Applicable legal standards

Section 300, subdivision (b) authorizes dependency jurisdiction where a "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child." The focus of a dependency proceeding is on averting harm to the child. (See generally, §§ 300, 300.2; see also *In re A.S.* (2011) 202 Cal.App.4th 237, 247; *In re Adam D.* (2010) 183 Cal.App.4th 1250, 1261.) "'The basic question under section 300 is whether circumstances at the time of the hearing subject the

---

[5] The sustained allegations read:

"b-1

"On a prior occasion, . . . [L.R.] was inappropriately touched when the child was thirteen years old. The child does not wish to reside in the home and care of [grandmother], due to the inappropriate touching. The [grandmother] . . . knew of the inappropriate touching of the child and failed to protect the child. Such inappropriate touching of the child, and the [grandmother's] failure to protect the child, endangers the child's physical health and safety placing the child at risk of physical harm, damage, danger, sexual abuse and failure to protect.

"b-2

"On a prior occasion in 2012, . . . [grandmother] inappropriately disciplined . . . [L.R.] by striking the child's head with a baking sheet. The child does not wish to reside in the home and care of the mother, due to the physical discipline by the [grandmother]. Such physical discipline of the child by the [grandmother] endangers the child's physical health and safety, placing the child at risk of physical harm, damage, danger, and physical abuse."

minor to the defined risk of harm.'" (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022 (*J.N.*).)

A finding that the minor is a person described in section 300 must be supported by a preponderance of the evidence. (§ 355, subd. (a); *J.N.*, *supra*, 181 Cal.App.4th at p. 1022.) As pertinent here, the juvenile court need not find that the child actually has been harmed or is at current risk of harm. (*In re Adam D.*, *supra*, 183 Cal.App.4th at p. 1261.) Rather, the court must find that at the time of the jurisdictional hearing, the child is at substantial risk of a defined and serious physical harm. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1397; *J.N.*, at pp. 1023–1024; *In re David M.* (2005) 134 Cal.App.4th 822, 829.) "[E]vidence of past conduct may be probative of current conditions." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824.) But the evidence as a whole must be considered. Prior acts of neglect, standing alone, do not establish a substantial risk of harm; there must be some reason beyond mere speculation to believe they will reoccur. (*Ibid.*)

We review the court's jurisdictional findings for substantial evidence. (*J.N.*, *supra*, 181 Cal.App.4th at p. 1022.) Under this standard, "'we must uphold the . . . [jurisdictional] findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support [them].'" (*Ibid.*)

b.      *Dependency jurisdiction improperly asserted based on isolated instance of inappropriate physical discipline*

Grandmother admits she "lost it" once during an argument with L.R. in 2012, and hit the child with an aluminum baking pan. There is no dispute that grandmother had not hit L.R. (with or without an object) before this incident of concededly inappropriate behavior and has not hit L.R. since this incident. Nor is there evidence that L.R. suffered any bruises or marks or, according to her aunt, that L.R. even took the incident very seriously. Nevertheless, DCFS maintains that jurisdiction was properly asserted because "it was clear from the record that the conflict between [grandmother] and [L.R.] was escalating, as demonstrated by the fact that [L.R.] did not want to live with

[grandmother]," and "there would [otherwise] be no mechanism in place to protect [L.R.] if [grandmother] 'lost it' again." Grandmother maintains there is insufficient evidence to support the assertion of juvenile court jurisdiction under section 300, subdivision (b) based on this isolated incident of inappropriate discipline.

Grandmother is correct. As stated above, the question under section 300 is whether a preponderance of evidence demonstrates, at the time of the jurisdictional hearing, that the child faces a specific, defined risk of substantial physical harm. (*In re David M.*, *supra*, 134 Cal.App.4th at p. 829; *J.N.*, *supra*, 181 Cal.App.4th at p. 1022.) No such showing was made here.

There is evidence that grandmother lost control once—an incident she regretted— and otherwise has always disciplined the children by revoking privileges or assigning extra chores. Although DCFS found grandmother's actions inappropriate, the record contains no evidence she physically abused L.R. It is unlikely that L.R. faces a risk of future harm. Clearly, L.R. believes she has been treated unfairly and is not adequately appreciated by her family. Even if she is correct, there is no evidence these conditions would subject this teen to substantial risk of serious physical harm as a result of other acts by grandmother of similarly inappropriate physical discipline. Under the circumstances, this isolated incident constitutes an insufficient basis for assertion of jurisdiction under section 300. (See *J.N.*, *supra*, 181 Cal.App.4th at pp. 1025–1026; *In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1136–1138.)

c. *Dependency jurisdiction properly asserted based on instance of inappropriate touching*

Although the siblings' accounts vary, grandmother concedes that "something" occurred between the siblings in the pool in 2011, and inappropriate touching was involved. J.R. admits he initiated the incident. Grandmother argues that the pivotal issue is not whether J.R. sexually abused or inappropriately touched his sister, but whether she acted appropriately to protect L.R. and whether she remains at risk of further abuse. L.R.

agrees this is the issue presented on appeal.[6]  She maintains, however, that the juvenile court correctly found that "the risk of future harm was very much continuing, so long as the children remained under one roof together," with only the minimal protection of continual supervision and without addressing therapeutically for J.R. the risk that he would again engage in similar misconduct.

A true finding under section 300, subdivision (b) requires proof of:  "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*Rocco M.*, *supra*, 1 Cal.App.4th at p. 820.)  "The third element . . . effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future." (*Savannah M*., *supra*, 131 Cal.App.4th at p. 1396; accord, *David M.*, *supra*, 134 Cal.App.4th at p. 829.)  Jurisdiction is improperly asserted if the facts alleged represent an isolated instance of past parental neglect without future risk.  Thus, for example, jurisdiction was improper based on a single incident of sexual abuse by a family friend in whose care children were placed, where the evidence showed the parents responded appropriately to ameliorate the risk and the children would never again be entrusted to his care.  (*Savannah M*., at pp. 1396–1398.)

In this case, the juvenile court was warranted in finding a risk of future harm. After grandmother became aware of the pool incident and the risks posed by J.R.'s inappropriate touching, she took the advice of his counselor and implemented a safety plan that allowed J.R. to remain in the home, but required that the children never be left alone together.  To be sure, that plan decreased the opportunities for inappropriate contact to occur.  It did not, however, necessarily create a safe home environment for L.R.  First, it did nothing to alleviate the specific underlying risk, as there is no evidence that J.R.'s counseling treatment was adjusted in any respect to address his indisputably inappropriate behavior in the pool.

---

[6] DCFS does not address this issue on appeal.

Second, the record reflects that L.R.'s family disbelieved her account of the abuse. At the time of the initial referral, when L.R. tried to recount the incident for a social worker, she stopped short after grandmother signaled her to be quiet. After the social worker left, grandmother contributed to L.R.'s feelings of fear, vulnerability and being a less important family member than J.R., when she confronted L.R., saying, "'you want something to happen to him, don't you!'" In July 2013, grandmother told the social worker L.R. had an "imagination and . . . is probably exaggerating this." Two years after the pool incident, and with a safety plan in place, grandmother told DCFS she still did not know what to believe. Even L.R.'s aunt, the adult with whom L.R. feels the closest bond, spoke of the siblings telling different "stories." Although there was contradiction in L.R.'s recitations as to whether she saw J.R.'s erect penis or he achieved penetration, even J.R. admits he initiated inappropriate contact with his sister in the pool. So long as he remained in the family home, there was a risk that another incident of abuse might occur, particularly when there was no indication J.R. received treatment or counseling to address his sexualized behavior with his sibling.

Third, L.R. feared J.R.'s violent propensities. That fear was not unfounded in light of the fact that he had broken grandmother's arm, and had struck his sister at least once. Thus, L.R. did not feel safe, trusted or protected in grandmother's home. Substantial evidence supports the court's conclusion that a long-term plan simply to maintain vigilant supervision over two teens living under the same roof for the long-term, without addressing J.R.'s troubling underlying behavior, was inadequate to prevent the risk of future physical harm.

*2. Disposition*

Grandmother argues there is insufficient evidence to support the juvenile court's dispositional orders removing L.R. from her care, and requiring monitored visits in a therapeutic setting.[7]

    *a. Legal standard*

"Section 361, subdivision (c)(1), provides [that a child] 'shall not be removed from the home in which [she is] residing at the time of the petition unless there is clear and convincing evidence of a substantial danger to the [child]'s physical health, safety, protection, or physical or emotional well-being *and* there are no 'reasonable means' by which the [child] can be protected without removal.'" (*In re Noe F.* (2013) 213 Cal.App.4th 358, 367.) Section 361, also provides that a child may be removed from a parent's custody if "the [child] has been sexually abused, or is . . . at substantial risk of sexual abuse by a [member] of [the child's] household, . . . [and] the [child] does not wish to return home." (§ 361, subd. (c)(4).)

"The jurisdictional findings are prima facie evidence the [child] cannot safely remain in the home." (*In re T.V.* (2013) 217 Cal.App.4th 126, 135.) "'"[T]he [child] need not have been actually harmed before removal is appropriate."'" (*In re A.S.*, *supra*, 202 Cal.App.4th at p. 247.) The focus here, as elsewhere, is on averting harm to the child. (*Ibid*.) In making its dispositional orders, the juvenile court may consider, not just a parent's current circumstances, but also his or her past conduct in determining whether the child is at risk of danger. (*Rocco M.*, *supra*, 1 Cal.App.4th at p. 824.) We review dispositional orders for substantial evidence, bearing in mind that the court was required to make its orders based on the standard of clear and convincing evidence. (*In re Noe F.*, *supra*, 213 Cal.App.4th at

---

**7** We reject DCFS's assertion that grandmother forfeited her right to object to the dispositional orders for failure to assert specific objections below. She contested the juvenile court's removal and visitation orders. "Even if a parent [fails to] contest the state of the evidence, . . . she preserves the right to challenge it as insufficient to support a particular legal conclusion." (*In re Javier G.* (2006) 137 Cal.App.4th 453, 464.)

p. 367.)  Here, there is substantial evidence to support the court's order removing L.R. from grandmother's physical custody under either subdivision (c)(1) or (c)(4) of section 361.

        b.        *Substantial evidence supports the removal order*

        The court proceeded to disposition immediately after sustaining an allegation that L.R. was inappropriately touched.  Grandmother concedes that whatever happened in the pool, it involved inappropriate touching by 15-year-old J.R. of his 13-year-old sister.  L.R. told DCFS she did not feel safe in grandmother's house for several reasons, including the fact that her brother remained in the house.  She did not want to return.  Under section 361, in light of the fact that L.R. was, at a minimum, inappropriately touched by her brother in their home and did not want to return home, removal was in order.  (§ 361, subd. (c)(4); see *In re Esperanza G.* (1985) 173 Cal.App.3d 358, 359 [Under section 361, court erred in returning child to family's home where she feared a repetition of sexual abuse she suffered there several years earlier.].)  The removal order was also warranted under section 361, subdivision (c)(1), as J.R. remained in the home and there was no evidence the underlying issues which led him inappropriately to touch his sister had been addressed.  Without addressing those issues, L.R. could not safely return home.  Like the trial court, we reject grandmother's assertion that her safety plan to maintain constant vigilance over the two teens and never to leave L.R. alone constituted reasonable means to protect her short of removal.  Again, so long as J.R. was there, the family did nothing to address his underlying behavioral issues, and L.R. continued to feel afraid and unsafe, the court justifiably concluded there were no reasonable means to protect her in grandmother's house.

3.     *Visitation order*

        a.       *Legal standard*

        The juvenile court has the duty to safeguard the parties' rights to visitation by balancing a parent's rights with the best interests of the child.  (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757; *In re S.H.* (2003) 111 Cal.App.4th 310, 317 [court's must "ensure regular parent-child visitation occurs while [simultaneously] providing for flexibility in response to [child's] changing needs . . . and . . . dynamic family circumstances"].)  The court has the authority to determine the right to visitation, as well as its length and frequency,

and may impose any other conditions or requirements on visitation that, in the court's view, the circumstances require. (*Jennifer G.*, at p. 757.) We review a juvenile court visitation order for abuse of discretion. (*In re R.R.* (2010) 187 Cal.App.4th 1264, 1284.) The test is whether a rational trier of fact could find the visitation order advanced the child's best interests. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.) To find an abuse of discretion, we must conclude that the court's ruling fell outside the bounds of reason. (*Ibid.*)

b.      *Monitored visits in a therapeutic setting was an appropriate order*

At the request of L.R.'s counsel, the court restricted contact between L.R. and grandmother to monitored visits in a therapeutic setting, once L.R.'s therapist deemed such contact appropriate. L.R. had been inappropriately touched by her brother, and felt marginalized and unfairly treated by family members on whom she relied for protection. She did not think grandmother believed her account of what had happened in the pool. Afterwards, L.R. was never allowed to be alone and felt untrusted. It is clear there are a number of issues this family needs to address. Accordingly, the court reasonably concluded that monitored visits in the presence of a trained therapist was a reasonable means to assist them in that endeavor. In light of the fact that L.R. continued to waver as to whether she wanted to see grandmother, forcing the teen into unmonitored visits without therapeutic supervision would likely be counterproductive to reunification efforts. Visits in a therapeutic setting were in L.R.'s best interests until she felt safe with and trusted by her grandmother. The court acted well within its discretion.

**DISPOSITION**

The matter is reversed as to the court's finding of jurisdiction pursuant to Welfare and Institutions Code section 300, subdivision (b) and remanded to the juvenile court with instructions to strike allegation (b)(2).  In all other respects, the order is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


CHANEY, Acting P. J.


MILLER, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.